UNITED GAS PIPE LINE COMPANY, et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 79–3209.

United States Court of Appeals, Fifth Circuit.

July 6, 1981.

Rehearing Denied Oct. 15, 1981.

Irving Jacob Golub, John S. Carr, Douglas W. Rasch, Houston, Tex., for United Gas Pipe Line Co.

David B. Robinson, Washington, D.C., for State of Louisiana.

Patrick J. Keeley, Michael J. Manning, Washington, D.C., for Entex, Inc.

John A. Cameron, Jr., Telemac N. Chryssikos, F.E.R.C., Washington, D.C., for Federal Energy Regulatory Commission.

Richard A. Solomon, Washington, D.C., Peter H. Schiff, Albany, N.Y., for Public Service Commission of the State of New York.

Joseph P. Stevens, Brooklyn, N.Y., Russell Fleming, Jr., Elizabeth, N.J., for The Brooklyn Union Gas Co. (Brooklyn Union) and Elizabethtown Gas Co. (Elizabethtown).

J. David Mann, Jr., Washington, D.C., for Laclede Gas Co.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

HENDERSON, Circuit Judge:

United Gas Pipe Line Company (hereinafter referred to as "United") and the State of Louisiana petition for review of the Federal Energy Regulatory Commission's (hereinafter referred to as "the Commission")[1] Order Allocating Cost of Emergency Gas, issued in *United Gas Pipe Line Co.*, Docket No. RP72–133 (July 18, 1979) (hereinafter sometimes referred to as "the order"). The order prohibited the recovery of certain expenses by United in the manner it had employed theretofore. We find that the Commission properly interpreted its regulations and the Natural Gas Act, adequately articulated its reasoning and findings and did not improperly discriminate against United. Accordingly we affirm the order.

It is the Commission's statutory duty to insure that the rates, charges and practices of natural gas companies are just and reasonable. Natural Gas Act (NGA) §§ 1(b), 4, 5, 15 U.S.C.A. §§ 717(b), 717c, 717d. As this case demonstrates, review of rates and practices is quite complicated and oftentimes appears interminable. The Commission has developed numerous time saving mechanisms in a laudable effort to ease the regulatory burden. Since 1972 it has permitted pipelines to include purchased gas

---

1. FERC assumed most of the duties of the Federal Power Commission on October 1, 1977. As used in this opinion, the term "Commission" refers to one or the other agency depending on the date of the action discussed.

cost adjustment clauses (hereinafter referred to as "PGA clauses") in their Commission-filed tariffs in order to facilitate recovery of gas costs, which are a major and volatile component of the cost of service of most pipelines. 18 C.F.R. § 154.-38(d)(4); *see* Order No. 452, 47 F.P.C. 1049, *modified and rehearing denied*, 47 F.P.C. 1510 (1972), *amended*, 49 F.P.C. 84 (1973).

The Commission accepted United's PGA clause, with certain modifications, in 1972. 48 F.P.C. 413, *rehearing denied*, 48 F.P.C. 749. United was authorized to adjust its rates twice a year and to allocate its increased costs to jurisdictional customers in proportion to their total purchases from United during the PGA period. The Commission has now ordered United to cease charging the costs of its emergency gas purchases to its customers on a proportional, or rolled-in, basis.[2]

When it became clear that shortages might require pipelines to curtail deliveries, the Commission issued regulations permitting pipelines to make short-term emergency purchases without prior Commission approval. 18 C.F.R. §§ 2.68, 157.29; *see* 18 C.F.R. §§ 157.45–.52. The regulations permit pipelines to buy emergency gas for system-wide supply, 18 C.F.R. § 157.-48(d)(1), or to make purchases at the request of particular customers and assign the associated costs directly to individual requesting customers, 18 C.F.R. § 157.-48(d)(2)(i), or to all requesting customers on a weighted average cost basis, 18 C.F.R. § 157.48(d)(2)(ii). The Commission accepted United's PGA clause after issuance of the emergency-gas regulations, and specifically provided that United could recover the costs

of its emergency purchases through PGA adjustments. 48 F.P.C. at 414.

United recently encountered such severe supply shortages that it had to cut back deliveries. This court approved a curtailment plan for United in *Southern Natural Gas Co. v. FPC*, 543 F.2d 530 (5th Cir. 1976). The plan divides United's sales into three classes according to end use—gas ultimately consumed by domestic customers (priority I); gas used as feedstock by direct industrial customers (priority II); and gas for all other industrial purposes, including gas to generate electricity (priority III). United must satisfy all priority I demand before it sells any gas to priority II customers, and must meet all priority II needs before furnishing gas to priority III customers.[3]

On May 16, 1972, United submitted new tariffs for PGA recovery of the cost of emergency gas purchased during the winter. Brooklyn Union Gas Company and Elizabethtown Gas Company petitioned the Commission for permission to intervene. These intervenors are indirect distributor customers of United. They buy gas from pipelines which in turn procure their supply from United. They insisted that in light of United's curtailment plan proportional allocation of the cost of United's emergency purchases among all customers, through PGA recovery, would be unduly discriminatory and, consequently, a violation of the Natural Gas Act. Order of August 11, 1977, at 2. The demand of high priority customers could be satisfied from the gas supply normally available to United,[4] so the intervenors reasoned that emergency gas, which is usually much more expensive than

---

**2.** Rolled-in allocation . . . [is a] method of ratemaking wherein the cost of new facilities and new gas supplies are collected or "rolled in" with the cost of older facilities and gas supplies for the purpose of determining the cost of the entire system which is then prorated among all of the customers. This method is generally disadvantageous to old customers of an existing pipeline since the cost of new facilities and new gas supplies historically has risen steadily and the rolled-in rate method requires old customers to pay a higher price and bear part of the cost of an expan-

sion from which they receive little increase in service . . . .
H. Williams & C. Meyers, *Oil and Gas Terms* 508–09 (4th ed. 1976).

**3.** The plan is more complicated than here stated, but this summary will serve our purposes. United sells a great deal of gas to cities and industrial users in Louisiana. The State of Louisiana supports the position taken by United.

**4.** Deliveries to priority I customers were never curtailed.

gas bought under long term contracts, was purchased solely to meet the demand of low priority customers. As the beneficiaries of emergency purchases, the argument goes, United's low priority customers should bear the burden of the premium price United must pay for the gas.

The Commission granted intervention and conducted an investigation under the authority of N.G.A. § 5, 15 U.S.C.A. § 717d.[5] The investigation culminated in the order we now review. The Commission concluded that "the method of pricing United uses [to recover the cost of emergency gas] is unjust, unreasonable, unduly discriminatory, and preferential, in violation of section 5 of the Natural Gas Act." Order at 1–2. Accordingly, the Commission prohibited United from using rolled-in pricing to recover its emergency-gas costs

> unless there is a direct benefit to all classes of customers.... This benefit exists with respect to emergency gas that United purchases to meet its customers [sic] high priority requirements. United may continue to allocate costs on a rolled-in basis for that purpose. However, if United's emergency purchases are not being used to meet its storage injection schedule or to relieve curtailment in priority 1, United may allocate the costs only in accordance with section 157.-48(d)(2) of our regulations.

Order at 13. The Commission left the door open for modification of the order in the event of changed circumstances. *Id.*[6]

The petitioners do not maintain that United has an absolute right to recover its emergency-gas expenditures on a rolled-in basis. Nor do they claim that the Commission cannot prevent pipelines from transporting such gas except as brokers for individual customers. They do insist that the Commission has failed to make an adequate explanation, and, more fundamentally, that it has unlawfully discriminated by allowing all other pipelines to purchase emergency gas for system-wide consumption while denying United that option. The Commission did specify its reasons, however, and it has not unfairly discriminated against United.

The parties agree that a regulatory agency must investigate when anticipating significant action and, after considering all the relevant material, articulate the reasoning behind its decision. Our first question focuses on whether the Commission adequately explained the basis of its decision.

Broadly speaking, the Commission found two basic faults in United's pricing system: (1) it resulted in gross discrimination against high priority customers, and (2) it failed to encourage conservation of natural

---

**5.** The administrative proceedings were complex. United initially proposed that its PGA increase be effective July 1, 1977. On June 30, 1977, the Commission suspended the rates until July 2, 1977, and ordered United to revise its filing to exclude certain claimed costs. United complied on July 12, 1977, and on the same day, Brooklyn Union Gas Company and Elizabethtown Gas Company requested an investigation and filed an untimely motion to intervene. The Commission granted intervention, accepted United's revised PGA tariff subject to refund pursuant to the provisions of NGA § 4, 15 U.S.C.A. § 717c, and instituted an investigation. See Order of August 11, 1977. Other interested parties intervened at various times. On rehearing the Commission agreed with United that any modification of United's tariff could be prospective only, and therefore terminated the refund condition and the NGA § 4 aspects of its investigation. *See* Order of November 29, 1977.

**6.** United and the State of Louisiana do not direct their arguments to the pricing mecha-

nisms approved by FERC; they simply insist that United should be allowed to continue to use rolled-in pricing. (At oral argument before us, the other intervenors defended the order.) The petitioners do not contend that FERC has exceeded its jurisdiction by requiring United to allocate emergency gas to non-jurisdictional customers, *see* NGA § 1(b), 15 U.S.C.A. § 717(b); *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 636–38, 92 S.Ct. 1827, 1836–37, 32 L.Ed.2d 369, 383 (1972). The order did not set rates for non-jurisdictional sales, but only precluded the imposition of certain costs—*viz* those associated with emergency gas purchases—upon some of United's jurisdictional customers. *Cf. Mississippi Pub. Serv. Comm'n v. FPC*, 522 F.2d 1345, 1350 (5th Cir. 1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976) (transportation jurisdiction allows Commission to require high priority customers to compensate curtailed low priority customers).

gas and substitution of more-abundant fuels.

Section 5(a) of the Natural Gas Act, 15 U.S.C.A. § 717d(a), requires the Commission to ferret out and remedy "unduly discriminatory" practices. Under United's court-ordered curtailment plan "high-priority customers have experienced very little curtailment." Order at 8.[7] Since low priority customers are the primary beneficiaries of emergency gas, the Commission concluded that it is only just that they pay for it.[8] Rolled-in pricing imposed a substantial cost burden on many customers who received no benefit from emergency purchases, and the Commission concluded that United's pricing system resulted in "overwhelming discrimination" against high priority customers and in favor of low priority customers. Order at 10.[9]

If the finding of discrimination is a corollary of the curtailment plan, the Commission's second consideration—that brokered sales of emergency gas will serve to promote the efficient use of gas by United's customers—may be said to follow from some of the same conclusions that went into the formulation of he plan.

The conflicting interests of those involved and the many, often inconsistent goals the planners would effectuate make the design of a satisfactory curtailment plan extremely difficult. With United's plan the primary determinant of the priority assigned a given class of customers was elasticity of demand. Those with alternative energy sources and those who could most easily reduce consumption or deal with supply disruptions were given the lowest priority and are the first to be curtailed. *See Southern Natural Gas Co.*

When a curtailment plan groups customers according to their ability and willingness to find substitute fuel, the goal of encouraging efficient utilization of gas will be further served by allocating high cost gas to low priority customers. Although the Commission was not free to uncritically impose high cost gas on low priority customers, *cf. Elizabethtown Gas Co. v. FERC*, 575 F.2d 885 (D.C.Cir.1978); *Fort Pierce Util. Auth. v. FPC*, 526 F.2d 993 (5th Cir. 1976); *Mississippi Pub. Serv. Comm'n v. FPC*, 522 F.2d 1345 (5th Cir. 1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976) (Commission has jurisdiction to order high priority customers to compensate curtailed low priority customers for their off-line purchases, and must develop its record on the issue), here the Commission specifically found that allocating high cost emergency gas to United's low priority customers will encourage them to find substitute fuels and make more efficient use of the gas they do receive. Order at 8.

■ This brings us to the petitioners' second major contention that the Commission unfairly singled out United from among all other pipelines.

To a great extent the Commission's decision was predicated on assumptions that could be broadly applied to the area it regulates. The petitioners point out that if these assumptions are valid with respect to United they are equally true for all other pipelines. Hence, they insist, the Commission cannot with any degree of consistency allow all other pipelines to continue using rolled-in pricing of emergency gas while denying United the same privilege.[10]

---

7. *See* note 4, *supra.*

8. United also attacks, as "totally arbitrary and factually untenable," "the erroneous hypothesis that emergency gas is a separate and distinct supply which is delivered only to the lowest priority customers...." The order recognized that once gas is in a pipeline its source cannot be identified. The Commission's analysis was not predicated on following particular molecules of gas from wellhead to ultimate consumer; the Commission simply ruled that when an emergency purchase has no effect on

the supply of gas available to United's high priority customers they cannot be charged for it. *Cf. Fort Pierce Util. Auth. v. FPC*, 526 F.2d 993, 996 (5th Cir. 1976).

9. The Commission also noted that jurisdictional and pipeline customers faced the greatest unfavorable burden-benefit disparity.

10. United brought this issue to the attention of the Commission, which found United's position "untenable." The Commission apparently un-

■ The Commission can and should change its policies if experience indicates an unwise course, and modify them to deal with unexpected events. However, although "the Agency has broad powers to regulate, and in so doing to choose between rulemaking and individual decisional processes, it also has a duty to define and apply its policies in a minimally responsible and evenhanded way." *Distrigas of Massachusetts Corp. v. FPC*, 517 F.2d 761, 765 (1st Cir. 1975); *cf Mesa Petroleum Co. v. FPC*, 441 F.2d 182, 191–92 (5th Cir. 1971) (Commission must give "cogent explanation" of different treatment of those who seem to be "on an equal footing"). In other words, "The variety of problems dealt with make absolute consistency, perfect symmetry, impossible. And the law reflects its good sense by not exacting it. But law does not permit an agency to grant to one person the right that which it denies to another similarly situated." *Mary Carter Paint Co. v. FTC*, 333 F.2d 654, 660 (5th Cir. 1964) (J. Brown concurring), *rev'd*, 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965).[11]

United would have us characterize the order as the Commission's first departure from a long established practice of allocating pipeline costs to consumers on a rolled-in basis. To be sure, the order itself noted

that as a general matter "The Commission has historically favored the rolled-in approach for cost allocation [citations omitted]." Order at 10. However, as the Commission also noted, where a pipeline's compensable services have benefitted particular customers to the exclusion of the rest, the associated costs have been placed directly on the served customers. Order at 11; Order of August 11, 1977, at 3. The Commission's point is well taken. Its reported opinions show that it has not hesitated to require direct cost allocation rather than "blindly adhere to a principle [of rolled-in pricing that would] lead to unfair and inequitable results." *Colorado Interstate Gas Co.*, 19 F.P.C. 1012, 1021 (1958); *accord, United Gas Pipe Line Co.*, 31 F.P.C. 1180, 1197 (1964) (rolled-in pricing too disruptive although usually favored); *Natural Gas Pipeline Co. of America*, 12 F.P.C. 708, 720–21 (1953) (new customers pay for new gas); *see Battle Creek Gas Co. v. FPC*, 281 F.2d 42, 47 (D.C.Cir.1960); *Panhandle Eastern Pipe Line Co.*, 13 F.P.C. 53 (1954) (segregated facilities). It is true that these cases did not govern allocation of the cost of emergency gas, but they do evidence Commission recognition that the administrative convenience of rolled-in pricing cannot justify unfair results.[12]

derstood this argument to mean that United would be unable to compete effectively for emergency gas. The Commission correctly noted that "the manner by which United prices emergency gas to its customers should have no bearing on the pipeline's ability to obtain supplies. The price the supplier commands will be the same whether United's costs are allocated incrementally or rolled-in." Order at 10. At this stage of the proceeding United's view is entitled to more notice. If the Commission was right about the effect of incremental pricing, some low priority customers will reduce their consumption—indeed this was the Commission's intent—with an attendant impact on United's revenue.

11. The consistent-treatment requirement is related to, but distinct from, the scope of an agency's discretion to choose between rulemaking and adjudication. The structure of the Natural Gas Act contemplates case-by-case decision making, *cf. NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), and the Commission has broad discretion in choosing its procedure, *NLRB v. Bell Aerospace Co.*, 416

U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The petitioners do not specifically attack the Commission's use of a rate proceeding to announce what they take to be a novel restriction on the use of rolled-in pricing, although they note that the Commission had previously declined to promulgate regulations on the matter. The analysis that follows would, with a shift of focus, also apply to a challenge to the Commission's decision to act in a rate proceeding.

12. The reasonableness of emergency purchases is also subject to agency review. The Commission has held that a pipeline may purchase emergency gas at a price "which a reasonably prudent pipeline purchaser would pay for gas under the same or similar circumstances." 52 F.P.C. 700 (1974), *aff'd sub nom. Shell Oil Co. v. FPC*, 520 F.2d 1061, 1068 (5th Cir. 1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). In reviewing the reasonableness of an emergency purchase the Commission considers all factors, but concentrates on the pipeline's supply situation, the price of alternative sources of gas and the relationship

Even if the Commission had consistently permitted rolled-in pricing, it would be entitled to change its policy. The petitioners' point is only that the Commission cannot have one policy for United and another for all other pipelines. Of course, so far as the rationale of the challenged order applies in other cases, we expect the Commission to follow it, and we can be sure that interested consumers will bring the matter to the Commission's attention.[13] The petitioners ignore the substantial distinctions between United's practices and those of other pipelines.

The regulations give a pipeline the option of brokering emergency gas for specific customers, and, as United admits, several pipelines already sell gas as brokers. United mentions that those pipelines still have an option that it has been denied—*i. e.* to include emergency gas in system-wide supply. What the petitioners seem to miss is that by brokering high cost gas other pipelines have avoided the rate discrimination condemned by the Natural Gas Act. The Commission probably cannot eliminate all discrimination in service, but it should, and under the Act must, eliminate such substantial discrimination as existed under United's rate schedule.[14]

The Commission was also motivated by its desire to encourage efficient use of natural gas. If the Commission's analysis is correct, the efficient use of scarce resources will always be encouraged by charging higher prices to those users who can cut consumption or find less expensive alternatives. *Cf.* Subchapter II of the Natural Gas Policy Act, 15 U.S.C.A. §§ 3341–3348 (1980 Supp.) (pipelines to pass through cost of some deregulated gas to boiler fuel users). It does not follow that those customers assigned to a curtailment plan's lowest priority will always have a highly elastic demand for gas. Some users are placed in a particular curtailment class not because of their ability to secure alternative sources of energy, but because of the perceived contribution of their activities to the public good. Thus, a fertilizer producer with no alternative feedstock may find itself in line behind a hospital which could locate alternative sources of heat, albeit at a substantial cost. *Compare FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), *with Southern Natural Gas Co.* (boiler fuel used to produce electricity). As pricing priority should follow curtailment priority only to the extent that curtailment priority was developed with reference to elasticity of demand, a detailed examination of a pipeline's entire operations is appropriate before the Commission precludes rolled-in pricing.[15] *Cf. Elizabethtown; Fort Pierce; Mississippi Pub. Serv. Comm'n.*

AFFIRMED.

SAM D. JOHNSON, Circuit Judge, specially concurring:

Although this writer joins in the majority opinion in this case, I wish to specially concur, not on a point of law, but on a matter of policy. Rather than permit the pipeline to "roll in" the cost of emergency gas supply purchases to all its customers, FERC ordered the pipeline either to incre-

---

between the seller and the pipeline. Transcontinental Gas Pipe Line Corp., 54 FPC 2120, 2121 (1975). The Commission was reviewing the business judgment of United's emergency purchases when it issued this order. Order of July 18, 1979, at 2–3.

13. *See* note 11, *supra*, note 15, *infra*.

14. Of course, if in the future another pipeline refuses to market gas as an intermediary, we *expect* the Commission to treat it like United or explain the difference. *Cf.* Order of November 29, 1977, at 5 (rulemaking may follow).

15. The Commission said as much when it announced it would reconsider its position should United's situation change. Order at 13.

The Commission also observed that the curtailment plans of United's pipeline customers, who can still use rolled-in pricing, may result in similarly situated end users paying different prices for gas. The Commission felt that in this case, where the resulting disparity was "far less severe" than that existing under United's rate tariff, this inequality could be overlooked. Order at 10. Should the problem prove to be more severe, the Commission may choose to make adjustments. In any case, there can be no argument that such disparity justifies illegal discrimination by United.

mentally price this cost to those whose curtailment was offset by the purchases, or to act as a broker for customers desiring to pay the actual cost for that gas. In return for enjoying the full benefit of the emergency purchases, FERC's order requires that the benefited low priority customer bear the full cost of his decision to consume that gas. This increases the efficient allocation of resources to the extent that the market price of the emergency purchase gas reflects the social cost of its consumption.[1]

FERC's order is but one example of an increased willingness to experiment with market-like allocations within a regulatory framework, all toward the goal of refining and improving traditional administrative regulation of the allocation of scarce resources. This trend of innovation has already been approvingly commented on in the legal literature.[2] Our affirmance here should be taken as adding judicial approval to these regulatory steps forward and should especially encourage FERC to continue with its efforts in this vein.

---

1. *See* Markovits, *A Basic Structure for Microeconomic Policy Analysis in Our Worse-Than-Second Best World: A Proposal and Critique of the Chicago Approach to the Study of Law and Economics*, 1975 Wisc.L.Rev. 950.

2. Note, *The Case for a White Market in the Allocation of Natural Gas During Shortages*, 57 Texas L.Rev. 615 (1979).