948 F.2d 1305
 292 U.S.App.D.C. 197
 ALGONQUIN GAS TRANSMISSION COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Central Hudson Gas & Electric Corporation, Boston Gas
Company, New Jersey Natural Gas Company, The City of
Norwich, Connecticut, et al., Colonial Gas Company, Orange
and Rockland Utilities, Inc., Bay State Gas Company, et al.,
Consolidated Edison Company of New York, Inc., New England
Power Company, Intervenors.
CENTRAL HUDSON GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The City of Norwich, Connecticut, et al., Colonial Gas
Company, Consolidated Edison Company of New York, Inc., Bay
State Gas Company, et al., Algonquin Gas Transmission
Company, Boston Gas Company, New England Power Company, New
Jersey Natural Gas Company, Orange and Rockland Utilities,
Inc., Intervenors.
ORANGE AND ROCKLAND UTILITIES, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
New Jersey Natural Gas Company, Colonial Gas Company, Bay
State Gas Company, et al., Boston Gas Company, Central
Hudson Gas & Electric Corporation, Consolidated Edison
Company of New York, Inc., New England Power Company, Orange
and Rockland Utilities, Inc., The City of Norwich,
Connecticut, et al., Algonquin Gas Transmission Company,
Intervenors.
CITY OF NORWICH, CONNECTICUT, DEPARTMENT OF PUBLIC
UTILITIES, and The Town of Middleborough,
Massachusetts, Municipal Gas and
Electric Department, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Algonquin Gas Transmission Company, New Jersey Natural Gas
Company, Colonial Gas Company, Bay State Gas Company, et
al., Boston Gas Company, Central Hudson Gas & Electric
Corporation, Consolidated Edison Company of New York, Inc.,
New England Power Company, Orange and Rockland Utilities,
Inc., Intervenors.
NEW JERSEY NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Algonquin Gas Transmission Company, Boston Gas Company, Bay
State Gas Company, et al., Central Hudson Gas & Electric
Corporation, Colonial Gas Company, Consolidated Edison
Company of New York, Inc., New England Power Company, Orange
and Rockland Utilities, Inc., The City of Norwich,
Connecticut, et al., Intervenors.
BOSTON GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Algonquin Gas Transmission Company, Bay State Gas Company,
et al., Central Hudson Gas & Electric Corporation, Colonial
Gas Company, Consolidated Edison Company of New York, Inc.,
New England Power Company, New Jersey Natural Gas Company,
Orange and Rockland Utilities, Inc., The City of Norwich,
Connecticut, et al., National Helium Corporation, Intervenors.
 Nos. 89-1634, 89-1668, 89-1693, 89-1709, 89-1736, 89-1744.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 29, 1990.
Decided Nov. 1, 1991.
As Amended Nov. 1, 1991.
 
 [292 U.S.App.D.C. 199] Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Henry S. May, Jr., with whom Gary M. Kotara and Catherine O'Harra for Algonquin Gas Transmission Co., Jennifer L. Miller and Catherine L. Nesser for Boston Gas Co., Joseph M. Oliver, Jr. and M. Lisanne Crowley for New Jersey Natural Gas Co., Stanley W. Balis and Demetrios G. Pulas, Jr., for the City of Norwich, Connecticut, et al., were on the joint brief, for petitioners in Nos. 89-1634, 89-1709, 89-1736 and 89-1744 and intervenors in Nos. 89-1668 and 89-1693. J. Evans Atwell and Judy M. Johnson, for Algonquin Gas Transmission Company, and Nicholas W. Mattis, Jr., for New Jersey Natural Gas Co., also entered appearances.
 Frederick J. Killion, with whom Donald K. Dankner for Cent. Hudson Gas and Elec. Corp., Steven J. Kalish and Barbara M. Gunther for Consolidated Edison Co., of New York, Inc., Edward B. Myers and Robert A. Nelson for Orange and Rockland Utilities, Inc. were on the joint brief, for petitioners in Nos. 89-1668 and 89-1693 and intervenors in Nos. 89-1634, 89-1709, 89-1736 and 89-1744. William I. Harkaway and Harvey L. Reiter also entered appearances for Consolidated Edison Co. of New York, Inc.
 Jill Hall, Attorney, Federal Energy Regulatory Com'n, with whom Jerome M. Feit, Sol., Federal Energy Regulatory Com'n was on the brief, for respondent in all cases. Robert H. Solomon, Attorney, Federal Energy Regulatory Com'n also entered an appearance for respondent.
 
 
 1
 William R. Connole with whom Eugene E. Threadgill was on the brief for intervenor, Colonial Gas Co. in all cases.
 
 
 2
 Mark A. Gallagher, John S. Schmid, Gearold L. Knowles and J. Richard Tiano entered appearances for intervenor, Bay State Gas Co., et al. in all cases.
 
 
 3
 Stephen A. Herman entered an appearance for intervenor, New England Power Co. in Nos. 89-1709, 89-1736 and 89-1744.
 
 
 4
 Julia R. Richardson and Lisa J. Gefen entered appearances for intervenor, National Helium Corp. in No. 89-1744.
 
 
 5
 Before MIKVA, Chief Judge, THOMAS* and HENDERSON, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge HENDERSON.
 
 HENDERSON, Circuit Judge:
 
 7
 Under review in this action are several portions of an order issued by the Federal Energy Regulatory Commission (FERC or the Commission). In accepting and modifying a contested settlement agreement between a natural gas pipeline and its customers, the Commission altered the gas cost and facilities cost recovery method [292 U.S.App.D.C. 200] provided in the agreement. The Commission also modified the fuel retention rate and the short-haul transportation rate reflected in the agreement. Under the relevant statute, before altering a settlement agreement, FERC must establish, first, that the agreement, as written, is unjust, unreasonable or unduly discriminatory and, second, that the proposed changes make it just and reasonable. Our review of the record establishes that the Commission failed to carry this statutory burden with respect to its alterations. We therefore grant the petitions for review and remand the proceeding for further action by the Commission.
 
 I.
 
 8
 Algonquin Gas Transmission Co. operates a natural gas transmission pipeline stretching from New Jersey, through New York, Connecticut and Rhode Island, to Massachusetts. Until 1981, Algonquin offered gas for sale to its local distribution customers under two "basic" rate schedules, F-1 and WS-1.[1] Under these rate schedules, Algonquin allocated the cost of the facilities necessary to provide its services on a "rolled-in" basis. That is, the costs of all of the transmission facilities were rolled in together and then recovered from each customer in proportion to the amount of gas each received. See ANR Pipeline Co. v. FERC, 771 F.2d 507, 510-11 (D.C.Cir.1985) (per curiam). Under rolled-in pricing, the amount of facilities costs the pipeline recovers from a particular customer depends on the volume of gas the customer purchases, not the service to which the customer subscribes.[2] On the other hand, Algonquin recovered the cost of the gas it sold under the F-1 and WS-1 schedules on an "incremental" basis. This method passed through to the customer, based on the service to which the customer subscribed, the cost that Algonquin itself incurred in purchasing gas from its supplier for sale under the two rate schedules.[3] The gas for Algonquin's two basic sales services, F-1 and WS-1, came from its supplier under different rate schedules. For this reason, the gas costs associated with Algonquin's two services varied independently of each other and in direct relation to the price under the supplier's applicable rate schedule. 47 FERC at 61,145.
 
 
 9
 At different times in the 1980s, the pipeline sought and received Commission approval to offer new services. Before 1981 Algonquin had offered a gas storage service under schedule STB but it had contracted with another gas company for the necessary facilities. In 1981, the pipeline spent $45 million on additional facilities that permitted it to offer the STB service relying exclusively on its own plant.[4] Beginning [292 U.S.App.D.C. 201] in 1986, Algonquin offered a second storage service under schedule SS-III. The pipeline constructed no new facilities before offering this service; it relied only on the facilities constructed for the STB service. For both of these storage services, Algonquin, with the Commission's approval, allocated the facilities costs on an incremental basis: it recovered the cost of constructing the new facilities only from those customers who subscribed to the services. See ANR Pipeline, 771 F.2d at 511; see generally Battle Creek Gas Co. v. FPC, 281 F.2d 42, 46-47 (D.C.Cir.1960).
 
 
 10
 In 1984 and 1985, Algonquin also began offering three new firm[5] sales services, F-2, F-3 and F-4. Under these new rate schedules, the subscribing customers purchase gas that Algonquin receives from three suppliers[6] who, under new agreements, supplement the pipeline's previous supply of gas. Algonquin constructed new transmission facilities in order to offer the new services.[7] For the three new services, Algonquin obtained Commission authorization to recover both the facilities costs and the gas costs incrementally rather than rolling the costs into the schedules for its other services.
 
 
 11
 Also at issue in this proceeding is Algonquin's short haul, T-1 rate schedule. Since 1967, Algonquin has offered a short haul, firm transportation service to customers near the origin of the pipeline. This service covers hauls with an average distance of only 25 miles. The T-1 rate schedule was designed on a mileage-sensitive basis so that customers under this schedule would bear only a portion of the facilities costs borne by other customers farther from the head of the pipeline. The rationale behind the T-1 schedule was that it was unnecessary for the short haul schedule to reflect the cost of all of the pipeline's facilities because the service under this schedule involved only a small portion of those facilities. The T-1 schedule also excluded from the rate base the cost of the facilities constructed for Algonquin's "incremental" sales and storage services (the F-2, F-3 and F-4 sales services and the STB and SS-III storage services).
 
 
 12
 This proceeding began in January 1986 when Algonquin filed with the Commission an application for a rate increase under docket number RP86-41.[8] The Commission accepted the filing, suspended the new rates for the statutory five-month period [292 U.S.App.D.C. 202] and then permitted them to go into effect subject to refund. See 15 U.S.C. § 717c(e); Algonquin Gas Transmission Co., 34 FERC p 61,278 (Feb. 28, 1986). At the hearing on Algonquin's proposed rates, the Commission staff argued against the continued incremental allocation of some of the pipeline's costs. The staff recommended that the facilities costs for all of the new or "incremental" services should be rolled in and recovered from all pipeline customers, including the T-1 customers, instead of from only the customers subscribing to those services. It recommended that the gas costs associated with the basic services, F-1 and WS-1, as well as with the F-4 service should be recovered on a rolled-in basis.[9] The staff also recommended abolishing the distance-sensitive nature of the T-1 schedule so that customers under the T-1 schedule would pay a fully allocated share of the pipeline's facilities costs. After a hearing on the rate proposal, the Administrative Law Judge (ALJ) concluded that the staff had failed to show that the incremental rate structure was unjust or unreasonable and therefore declined to order the roll-in the staff advocated. The ALJ also rejected the staff's recommendation to alter the distance-sensitive nature of the T-1 schedule. See Algonquin Gas Transmission Co., 39 FERC p 63,023 (May 12, 1987).
 
 
 13
 After the ALJ's initial decision, the parties attempted to negotiate a settlement. After negotiating an agreement, Algonquin filed it with the Commission as a contested settlement. It provided for the continuation of the incremental pricing structure for Algonquin's new services and continued in place the lower T-1 rate schedule for short-haul transportation. Before approving the agreement the Commission substantially modified it in several respects. It ordered the roll-in of all of the costs the pipeline had theretofore recovered on an incremental basis. This meant the roll-in of all gas and facilities costs associated with service under schedules F-1 through F-4, WS-1, STB, SS-III and T-1. The Commission also abolished the distance-sensitive nature of the T-1 rate schedule. Algonquin Gas Transmission Co., 47 FERC p 61,048 (Apr. 14, 1989).
 
 
 14
 In support of its blanket roll-in of facilities costs, the Commission stressed that Algonquin operated "an integrated system, in which all its facilities are interdependent and required to support the system," 47 FERC at 61,154, and it pointed to the fact that most of the incremental facilities are located along Algonquin's main line "and thus are the type of facilit[ies] benefitting all customers which the Commission traditionally requires to be rolled in." Id. The Commission found the incremental facilities would ensure more reliable service because the new looping would "enabl[e] Algonquin to provide continuous service ... if confronted with a rupture of its previously constructed unlooped line," id., and it noted that the incremental facilities "may make cheaper a further increase in Algonquin's capacity in the future." Id.
 
 
 15
 With respect to the rolled-in gas costs under the different rate schedules, the Commission declared:
 
 
 16
 All the gas Algonquin purchases for sale under these rate schedules is delivered to Algonquin at or near the beginning point of its system in New Jersey and is commingled in its system. There are no significant Btu content or pressure differences between the various sources of supply. Thus gas purchased from one supplier does not go only to customers purchasing under a particular rate schedule. Rather, all customers receive gas purchased from all suppliers.
 
 
 17
 Id. at 61,155 (footnotes omitted).
 
 
 18
 In connection with the short-haul rates, the Commission noted that Algonquin offered no mileage-sensitive rates other than the T-1 schedule and had no zones. The Commission ordered that a fully allocated share of the facilities costs be borne by the T-1 customers in order to avoid discriminatory rates and in order to "assure that each customer bears the portion of system costs [292 U.S.App.D.C. 203] associated with the service it receives." Id. at 61,151.[10]
 
 
 19
 After the Commission's initial decision, it issued a policy statement, Policy Statement Providing Guidance with Respect to the Designing of Rates, 47 FERC p 61,295 (May 30, 1989), clarified on reh'g, 48 FERC p 61,122 (July 27, 1989), intended to promote "rate design schemes tailored to particular pipelines which will [ensure] that market forces play a more significant role in determining the supply, the demand and the price of natural gas." Id. at 62,051. The Commission called for and received comments on the applicability of the policy statement to the design of Algonquin's rates.
 
 
 20
 On rehearing, the Commission declined to require further development of the record consistent with its policy statement; instead it stated that the parties would have that opportunity in the rate proceeding that was to begin shortly thereafter. Algonquin Gas Transmission Co., 49 FERC p 61,029, at 61,110 (Oct. 6, 1989). The rehearing order also affirmed the Commission's earlier ruling in all relevant respects. These petitions for review followed. The petitioners are Algonquin and those of its customers who will pay higher rates under the roll-in order. Colonial Gas Company is the sole Algonquin customer that stands to gain from the roll-in and has intervened in support of the Commission.
 
 II.
 
 21
 As we have explained frequently in the past, the Commission may act under two different sections of the Natural Gas Act (NGA or the Act) to effect a change in a gas company's rates. When the Commission reviews rate increases that a gas company has proposed, it is subject to the requirements of section 4(e) of the Act, 15 U.S.C. § 717c(e). Under section 4(e), the gas company bears the burden of proving that its proposed rates are reasonable. On the other hand, when the Commission seeks to impose its own rate determinations, rather than accepting or rejecting a change proposed by the gas company, it must do so in compliance with section 5(a) of the NGA. See ANR Pipeline Co. v. FERC, 771 F.2d 507, 513 (D.C.Cir.1985) (per curiam); Public Service Comm'n v. FERC, 642 F.2d 1335, 1345 (D.C.Cir.1980), (Transco), cert. denied, 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981). Here, the Commission modified a part of Algonquin's rate structure--incremental cost recovery--that the pipeline's new rate filings did not seek to change. In so doing, the Commission acted under section 5(a) of the Act.
 
 Section 5(a) provides that
 
 22
 [w]henever the Commission, after a hearing had upon its own motion ... shall find that any rate, charge, or classification demanded ... by any natural-gas company in connection with any transportation or sale of natural gas ... is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge [or] classification ... to be thereafter observed and in force, and shall fix the same by order.
 
 
 23
 15 U.S.C. § 717d(a). This section allows the Commission to impose its own rate determinations only if it finds that a gas company's rates are "unjust, unreasonable, unduly discriminatory, or preferential," id., and only if this finding is supported by substantial evidence in the record.[11] ANR [292 U.S.App.D.C. 204] Pipeline, 771 F.2d at 513. The Commission applied the proper standard under section 5(a). See 47 FERC at 61,155. Accordingly, we review the Commission's order to determine, first, whether it is supported by substantial evidence and, if so, whether the Commission's modification is just and reasonable.
 
 
 24
 A. Roll-In of Facilities Costs for the Incremental Services
 
 
 25
 In reaching its roll-in decision, the Commission emphasized that the facilities in question are primarily located along the main line and that they increase the pipeline's transmission capacity. From these facts, the Commission concluded that Algonquin's new facilities enable the pipeline to provide more reliable service to its customers and that they make cheaper and easier any future expansion that the pipeline might undertake. The Commission decided that the benefits from the new facilities accrue to all of Algonquin's customers and it would therefore be unjust and unreasonable to allocate their cost only to those subscribing to the incremental services. The order also relied on the Commission's historical preference for rolled-in rates when the pipeline in question is an "integrated" one. 47 FERC at 61,154-55.
 
 
 26
 Once we look beyond the Commission's conclusionary statements about the facilities' benefits, however, its order reveals less than careful consideration of the benefits that actually flow to the customers who will bear the financial burden of the facilities cost roll-in. The roll-in order discusses only one instance of a concrete, discernible benefit resulting from an identified portion of the incremental facilities. This instance is the 18.8 miles of looping that Algonquin installed near the origin of the pipeline. According to the order, this looping contributes to the reliability of the pipeline's service in two respects. First, it permits the operation of the preexisting, parallel segment of the line at a lower pressure, reducing the likelihood of rupture. Second, the looping ensures that, even in the event one line bursts, Algonquin will be able to continue its service through the parallel segment. 47 FERC at 61,153.
 
 
 27
 This analysis of discernible benefits is confined, however, to facilities associated with the F-4 schedule--and only a fraction of the F-4 facilities at that. See supra note 7. The Commission's order contains only the most general and cursory discussion of any benefits flowing to the pipeline's customers from other facilities the cost of which the Commission rolled into Algonquin's rates. 47 FERC at 61,154-55. The Commission states that many of the new facilities exist at or near the head of the pipeline and increase the line's capacity, thereby benefitting all of Algonquin's customers. It does not, however, segregate those facilities that provide such system-wide benefits from those that, because of their placement along the line, benefit only some of Algonquin's customers. Instead, it rolled in the cost of all facilities without conducting a sufficiently detailed inquiry into the question of whom they benefit.[12]
 
 
 28
 The Commission's indiscriminate approach does not carry its section 5(a) burden of producing substantial evidence to support its finding that the continuation of the incremental rate structure would be unjust and unreasonable. Where new facilities increase a pipeline's transmission capacity or the reliability of its service, they may benefit all customers to the extent necessary to justify a cost roll-in. In Great Lakes Gas Transmission Co., 45 FERC [292 U.S.App.D.C. 205] p 61,237 at 61,701 n. 55 (Nov. 17, 1988), the Commission stated that a roll-in is warranted when "the quality of the system's services is enhanced by the presence of the facilities in question." We do not quarrel with that standard. We do not suggest, for instance, as the petitioners argue, that substantial evidence to support a roll-in exists only when the record shows that the incremental facilities are a prerequisite to the provision of service. What we do require, however, is that the Commission, before ordering a roll-in under section 5(a), offer more than a conclusionary statement that the existence of system-wide benefits renders it unjust to allocate facilities costs incrementally.
 
 
 29
 We recognize that the question of how to allocate costs among a pipeline's customers is a "difficult issue of fact," Battle Creek Gas Co. v. FPC, 281 F.2d 42, 47 (D.C.Cir.1960), and one on which the Commission enjoys broad discretion. See Consolidated Gas Supply Corp v. FPC, 520 F.2d 1176, 1185 (D.C.Cir.1975). At oral argument, however, it became apparent that the Commission's position is that system-wide benefits exist primarily because the Commission says they do. An agency's unsupported assertion does not amount to substantial evidence. Instead, to support the facilities cost roll-in on remand, we direct that the Commission undertake an analysis of the benefits flowing from each of the incremental facilities to Algonquin's customers. Only when the Commission outlines with reasonable particularity the system-wide benefits which each new facility produces will the roll-in of that facility's cost be supported by substantial evidence as required under section 5(a) of the Natural Gas Act.
 
 
 30
 We turn briefly to the other justifications the Commission offered for its decision to roll in facilities costs. Apart from the largely unsupported assertion that the incremental facilities create benefits flowing to all of the system's customers, the Commission provided two explanations for its roll-in order. First, it noted its "long-standing policy of rolling in costs where a system operates on an integrated basis" as does Algonquin's pipeline. 47 FERC at 61,154. Second, it asserted that the incremental facilities "may make cheaper" some future system expansions that Algonquin might undertake. Id.
 
 
 31
 The Commission's asserted policy of rolling in the facilities costs in "integrated systems" cannot justify a roll-in order that is not otherwise supported by substantial evidence in the record. We first note that the Commission's observation that Algonquin's system operates "on an integrated basis to the benefit of all its customers" offers little in the way of a useful definition of an "integrated system."[13] We take this statement to mean that an "integrated system" is one in which all portions of the system benefit all customers. If this is the meaning the Commission attaches to the phrase, it merely presupposes the existence of the sort of evidence which, we hold, the Commission must produce to support its order. Absent evidence of specific system-wide benefits, the Commission's declaration that the pipeline is "integrated" provides no basis for rolling in facilities costs.
 
 
 32
 We also find unpersuasive the Commission's assertion that the roll-in is justified because the new facilities "may make cheaper" future expansions that Algonquin might undertake. 47 FERC at 61,154 (emphasis added). There is no evidence to which the Commission has pointed showing [292 U.S.App.D.C. 206] that Algonquin contemplates any future expansions that would be less costly because of the incremental facilities now in place. The Commission asks us to agree that, because, at some point in the future, Algonquin might undertake expansion that might be cheaper because of the incremental facilities, a present roll-in of the facilities is necessary to avoid an unjust or unreasonable result. We decline to join the Commission in such speculation.
 
 
 33
 Finally, we note briefly the basis the Commission articulated for allocating to all pipeline customers the cost associated with the construction of improvements to spurs leading off Algonquin's main line. In reaching its roll-in decision in connection with the spur improvements, the Commission relied on the fact that, in the past, Algonquin had rolled in the cost of its spurs: "the Commission believes that the additional looping added to [the spurs] should also be rolled in; there appears to be no reason to treat the spurs and the loops differently." 47 FERC at 61,154. Here again, we remind the Commission of its function when operating under section 5(a). The proper inquiry does not involve an analysis of the rationality and consistency of rolling in the cost of the original spurs while treating the spur looping costs incrementally; instead, the Commission must determine whether the incremental treatment of the new looping is unjust or unreasonable.
 
 
 34
 Because the Commission has not shown that the incremental facilities produce specific, system-wide benefits, it has failed to demonstrate that the continuation of incremental facilities cost recovery is unjust and unreasonable. Accordingly, we remand the portion of the order rolling in facilities costs for further action by the Commission.
 
 
 35
 B. Roll-In of Gas Costs for the Incremental Services
 
 
 36
 In reaching its decision to allocate the gas costs for Algonquin's various services on a rolled-in basis, the Commission relied on the identical nature of the gas Algonquin sells under its different rate schedules. The gas Algonquin sells, from whichever source it comes, enters the pipeline "at or near the beginning point of [the] system in New Jersey," the gas is "commingled" in the system and "[t]here are no significant Btu content or pressure differences between the various sources of supply." 47 FERC 61,155. Because "all customers receive gas purchased from all suppliers," id., the Commission concluded that it would be unjust and unreasonable to allocate the gas costs among the different rate schedules on an incremental basis.
 
 1. Effect of FERC's Policy Statement
 
 37
 The petitioners assert that the Commission erred in refusing to consider the impact of the new policy statement on the rate schedules at issue. They contend that, having announced a policy favoring the operation of market forces, the Commission was constrained to apply that policy to this proceeding at the rehearing stage.
 
 
 38
 On the question of the policy statement, the rehearing order states:
 
 
 39
 In this proceeding, the Commission is presented with a record that was developed prior to the Commission's articulating rate design policy objectives as reflected in the policy statement.... Because the parties will have an opportunity to create a record in light of the policy statement in Algonquin's new rate case [that will be filed in one month], the Commission has decided not to require development of a record consistent with the policy statement in this docket.
 
 
 40
 49 FERC at 61,110. In this court, the Commission takes the same position, asserting that it was not error to postpone consideration of the policy statement's impact on Algonquin's rates until the next rate proceeding, especially when the next rate case was to be filed less than one month after the release of the rehearing order.
 
 
 41
 The policy statement directs those involved in rate cases to "develop records consistent with the content of this policy statement." 47 FERC at 62,059. It gives the Commission latitude, however, to "decide in which [of several] proceeding[s] it would be appropriate to develop records on [292 U.S.App.D.C. 207] the issues discussed above." Id. The Commission did not refuse categorically to apply the policy statement; it merely postponed doing so until presented with a record developed along the lines the policy statement directs. Accordingly, the Commission was merely exercising its well-established discretion to "order [its] own proceedings and control [its] own docket[ ]," Association of Businesses Advocating Tariff Equity v. Hanzlik, 779 F.2d 697, 701 (D.C.Cir.1985), and its decision does not constitute an abuse of discretion. See also Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978); Natural Resources Defense Council v. SEC, 606 F.2d 1031, 1056 (D.C.Cir.1979).
 
 2. Cost Shifting
 
 42
 The petitioners urge reversal of the gas-cost roll-in on the ground that the Commission undertook no discussion of the effect the roll-in would have on the pipeline's customers. We have previously emphasized the Commission's duty to examine the cost-shifting effect of its orders. In Columbia Gas Transmission Corp. v. FERC, 628 F.2d 578, 587 (D.C.Cir.1979), we remanded a rate proceeding to the Commission because it had "fail[ed] to provide an adequate explanation for or any evidence in support of [a] geographical shifting of costs." Similarly, in North Carolina v. FERC, 584 F.2d 1003, 1012 (D.C.Cir.1978), we held that the Commission had not established that its order was just and reasonable "in light of [its] failure to make findings as to the impact the [order] would actually have on ultimate consumers."
 
 
 43
 The Commission's failure to determine the impact of its order is not, as the Commission's actions seem to indicate, a matter that is optional, at the Commission's discretion. From the very beginning of the Natural Gas Act, the courts have held that it is not the theory of a rate order but its impact that determines its legality.
 
 
 44
 Id. at 1014 (citing Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287-88, 88 L.Ed. 333 (1944)) (original emphasis). Because the FERC, in rolling in Algonquin's gas costs, did not explicitly consider the cost shifting that its order might effect, we hold that it has failed to ascertain that the mandated rates are just and reasonable. For this reason, we remand the portion of the order that rolled in gas costs for further action by the Commission.
 
 
 45
 C. Mileage-Sensitive Aspect of the T-1 Schedule
 
 
 46
 To explain its order abolishing the distance-sensitive design of the T-1 rate, the Commission noted that Algonquin does not offer its other transportation customers distance-sensitive rates and that the pipeline has no zones. 47 FERC at 61,151-52; 49 FERC at 61,112 (rehearing order). In light of these facts, the Commission decided the distance-sensitive aspect of the T-1 rate renders it unduly discriminatory under NGA section 5. To provide a just and reasonable rate, the Commission ordered Algonquin to increase the T-1 rate to "reflect a full allocation of costs," 47 FERC at 61,152, rather than the reduced fraction of the pipeline's facilities costs this rate previously reflected.
 
 
 47
 The Commission's regulations provide that a pipeline's rates "must reasonably reflect any material variation in the cost of providing the service due to ... [t]he distance over which the transportation is provided." 18 C.F.R. § 284.7(d)(3). In ordering the full allocation of facilities costs under the T-1 schedule, the Commission acted directly contrary to its own regulations. The Commission's order offers no justification for its departure from the announced policy in favor of distance-sensitive rates. Instead, it relies on the bald assertion that the ordered change in the rate has "become necessary to avoid discrimination among transportation customers." 47 FERC at 61,152.
 
 
 48
 It is axiomatic that "an agency is legally bound to respect its own regulations and commits procedural error it if fails to abide them." Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989). Of course, an agency is not forever foreclosed from "revisit[ing] existing interpretations of statutes that the [292 U.S.App.D.C. 208] agency is called on to administer." Hall v. Baker, 867 F.2d 693, 696 (D.C.Cir.1989). What is required, however, is that "in changing its course of policy, an agency [must] indicate that prior policies are being expressly changed and not casually ignored." Thomas Radio Co. v. FCC, 716 F.2d 921, 924 (D.C.Cir.1983). Here, the Commission has offered no "principled explanation," see National Black Media Coalition v. FCC, 775 F.2d 342, 355 (D.C.Cir.1985), for its abandonment of the preference for distance-sensitive rates, choosing instead to "play fast and loose with its own regulations." Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120, 1135 (D.C.Cir.1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). In the absence of such an explanation for the ruling, we are constrained to reverse that portion of the Commission's order allocating a full portion of Algonquin's facilities costs to the T-1 subscribers.
 
 
 49
 In this court, for the first time, the Commission points to record evidence that, it asserts, supports its ruling. We decline to rely on this evidence as a ground for affirming the order. First, we note that this evidence was nowhere considered in either of the Commission's orders below. It is well established that "courts may not accept appellate counsel's post hoc rationalizations for agency action." See, e.g., Motor Vehicle Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." Id.; see also SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). The evidence on which the Commission now relies does not provide a proper basis for upholding the order under review.
 
 
 50
 On remand, the Commission will be free to consider evidence of the T-1 schedule's discrimination. We remind the Commission, however, that discrimination among different pipeline customers does not alone cause a rate schedule to violate section 5 of the NGA. By the terms of the statute, a pipeline's rate must be "unduly discriminatory" before the Commission may alter it. 15 U.S.C. § 717d(a) (emphasis added). Only when a pipeline's rate schedule creates a "preference without a reasonable basis" does it offend section 5. Sebring Utilities Comm'n v. FERC, 591 F.2d 1003, 1010 n. 28 (5th Cir.), cert. denied, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979); see also Cities of Bethany, Bushnell, etc. v. FERC, 727 F.2d 1131, 1139 (D.C.Cir.) (under similar statute, Federal Power Act § 205(b), 16 U.S.C. § 824d(b), "mere fact of a rate disparity ... does not establish unlawful rate discrimination"), cert. denied, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984).
 
 D. Fuel Reimbursement Methodology
 
 51
 In its order, the Commission also altered the portion of Algonquin's settlement agreement that prescribed the method for calculating fuel reimbursement.[14] The petitioners challenge that aspect of the order as well. The parties presently before us agree that the correct method of calculating fuel reimbursement must be tied to the resolution of the issue of whether the pipeline's costs will be rolled in or recovered incrementally. See 47 FERC at 61,150. Because we are remanding the question of cost allocation to the Commission, we direct it to review and, if necessary, redetermine the question of fuel reimbursement as well.
 
 III.
 
 52
 To summarize, we remand to the Commission, for further action consistent with this opinion, the issues of the allocation of facilities costs and gas costs and the issue of whether the distance-sensitive component of the T-1 rate schedule is unduly [292 U.S.App.D.C. 209] discriminatory. We direct that, after resolving the cost allocation issues, the Commission is to determine whether the settlement agreement's formula for fuel reimbursement satisfies the standards of section 5.[15] The petitions for review are
 
 
 53
 Granted.
 
 
 
 *
 Former Circuit Judge Thomas, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion
 
 
 [1]
 F-1 service is a firm sales service available all year but subject to an annual limitation on the quantity of gas available to a customer equal to daily contract demand multiplied by 270 days. WS-1 is a winter "peaking" sales service available for a total of sixty days in the period between November 16 and April 15. Algonquin Gas Transmission Co., 47 Fed.Energy Reg. Comm'n Rep. (CCH) (hereinafter FERC) p 61,048, at 61,145 (April 14, 1989)
 
 
 [2]
 See United Gas Pipe Line v. FERC, 649 F.2d 1110, 1112 n. 2 (5th Cir.1981) (quoting H. WILLIAMS & C. MEYERS, OIL AND GAS TERMS 508-09 (4th ed. 1976)):
 Rolled-in allocation ... [is a] method of ratemaking wherein the cost of new facilities and new gas supplies are [sic] collected or "rolled in" with the cost of older facilities and gas supplies for the purpose of determining the cost of the entire system which is then prorated among all of the customers. This method is generally disadvantageous to old customers of an existing pipeline since the cost of new facilities and new gas supplies historically has risen steadily and the rolled-in method requires old customers to pay a higher price and bear part of the cost of an expansion from which they receive little increase in service.
 
 
 [3]
 Under both the F-1 and WS-1 rate schedules, Algonquin sold gas supplied by Texas Eastern Transmission Corp
 
 
 [4]
 The new STB facilities included the replacement of 2100 feet of the main line's 26-inch pipe, the installation of 21.1 miles of 30-inch "looping" on Algonquin's main line and the installation of two compressors. All of these improvements occurred at or near the origin of the pipeline. The Commission approved the new STB service in Algonquin Gas Transmission Co., 16 FERC p 61,119 (Aug. 11, 1981)
 Installation of "looping" along a pipeline involves the construction of "additional sections of pipe, laid parallel to portions of the existing pipe, which empty into the existing pipe at both ends of the 'loop pipeline.' This has the effect, because of the characteristics of gas physics, of increasing the carrying capacity of the whole pipeline." ANR Pipeline, 771 F.2d at 510 n. 4.
 
 
 [5]
 "Firm" sales service is provided under rate schedules or contracts that expressly obligate the gas company to deliver specific volumes of gas within a given time period. These schedules contemplate no interruption, but they may be interrupted in extraordinary circumstances when the gas supply to higher priority customers is threatened. Firm service differs from "interruptible" service which provides gas on a "when available" basis and may be interrupted after notice to the subscriber. See Arkansas Power & Light Co. v. FPC, 517 F.2d 1223, 1230 n. 20 (D.C.Cir.1975), cert. denied, 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 341 (1976); H. WILLIAMS & C. MEYERS, OIL AND GAS TERMS 275, 370 (5th ed. 1981)
 
 
 [6]
 Under schedule F-2, Algonquin sells gas it receives from Consolidated Gas Transmission Co.; under F-3, it sells gas from National Fuel Gas Supply Corp.; and under F-4, it sells gas from Texas Eastern Transmission Corp
 
 
 [7]
 In connection with the F-2 and the F-3 services, Algonquin constructed 10.3 miles of 10-inch looping on spurs leading off the main line, installed another compressor and increased the capacity of two existing compressors. The looping occurred mid-way along the pipeline and the compressors were located on the main line. In connection with the F-4 service, Algonquin installed a new compressor, modified an old one and constructed 18.8 miles of 30-inch looping along the main line and 15.2 miles of looping along four spurs running off the main line. 47 FERC at 61,152; see also Consolidated Gas Supply Corp., 27 FERC p 61,426 (June 18, 1984) (approving F-2 and F-3 service); Texas Eastern Transmission Corp., 32 FERC p 61,227 (Aug. 15, 1985) (approving F-4 service)
 
 
 [8]
 Algonquin filed a second tariff on October 31, 1986, under docket number RP87-14. Because of the subsequent filing, the first filing covered only the period from August 1, 1986 through April 30, 1987. Both proceedings raised the same issues of cost recovery. In the settlement the parties negotiated in the second proceeding, they agreed that the final determinations made in the first proceeding were to apply in the second proceeding. That settlement agreement is not the one under review
 
 
 [9]
 With respect to the F-2 and F-3 services, the staff did not recommend rolling in the gas costs
 
 
 [10]
 Two different portions of the Commission's ruling caused an increase in the T-1 rates. First, the Commission included in the T-1 rate base the previously excluded cost of the "incremental" facilities. Second, under the Commission's ruling, the T-1 subscribers must pay a fully allocated share of the cost of all of the facilities rather than the reduced, distance-sensitive share charged under the settlement agreement
 
 
 [11]
 Intervenor Colonial Gas contends that the Commission must satisfy section 5(a)'s burden only when altering a rate structure it has expressly approved in an earlier rate proceeding. Here, Colonial asserts, the Commission merely certificated and permitted to go into effect the rates in question. Therefore, Colonial reasons, the Commission may act under section 4(e), placing the burden of proof on the pipeline. Colonial is the only party before the court to make this argument; both the pipeline and the Commission agree that section 5(a) is the applicable statute
 We rejected a similar argument in ANR Pipeline, holding that "each proposed change [must be] justified by the proponent of the change." 771 F.2d at 514; see also Transco, 642 F.2d at 1343-45. Here, as the proponent of the change in the rate structure, the Commission bears the burden of proof and therefore must, as it concedes, act under section 5(a). The intervenor's argument thus lacks merit.
 
 
 [12]
 Because an administrative order must stand or fall on the grounds articulated by the agency, see SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will not examine the record to determine whether any system-wide benefits that the Commission has not enumerated might exist. See also Motor Vehicle Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983)
 
 
 [13]
 The Commission also states that Algonquin's pipeline qualifies as "integrated" because it is one in which all "facilities are interdependent and required to support the system." 47 FERC at 61,154. We do not read this to mean that, without the incremental facilities here in question, the system would be unable to operate. The pipeline appears to have operated successfully before the installation of the new facilities so there is little reason to believe that, without them, Algonquin's operations would grind to a halt. Instead, we take this statement to mean that the Commission views the pipeline as integrated because it views all portions of the pipeline--including the incremental facilities--as in some way improving the quality of service to all customers. That is, the line is integrated because all of its components provide some benefit to all of its customers. The Commission must show that this finding of benefits is supported by substantial evidence
 
 
 [14]
 Compressors along Algonquin's pipeline move gas through the system. These compressors are fueled by gas that is diverted from the gas stream in the pipeline. The mechanism of fuel reimbursement allows Algonquin to recover from its customers for the gas necessary to move the gas. See Transcontinental Gas Pipe Line Corp., 46 FERC p 61,277 at 61,682, 61,684 (Feb. 23, 1989). Algonquin permits its customers to pay this fuel reimbursement figure either in cash or in kind
 
 
 [15]
 In urging reversal of the Commission's order, the petitioners challenge its failure to identify changed circumstances that render unjust the formerly approved incremental cost recovery. Because the Commission did not address changed circumstances and because we are remanding the Commission's determinations, we need not reach this issue